WILLIAM JHAVERI-WEEKS (SBN 289984)
wjw@jhaveriweeks.com
SARAH ABRAHAM (SBN 326098)
sa@jhaveriweeks.com
ALLY N. GIROUARD (SBN 336625)
ag@jhaveriweeks.com
THE JHAVERI-WEEKS FIRM, P.C.
351 California Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 463-8097
Facsimile: (415) 367-1439

*Attorneys for Plaintiff Denise Byers*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| DENISE BYERS,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>AERA TECHNOLOGY, INC.,<br><br>　　　　　　Defendant. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Denise Byers complains and alleges as follows:

## INTRODUCTION

1. Plaintiff is a former "Client Partner" (*i.e.*, salesperson) at Defendant Aera Technology Inc. ("Defendant," "Aera," or the "Company"), a Silicon Valley tech firm that sells a software platform that performs "cognitive automation" to improve various business processes. Ms. Byers had just turned sixty years old when Aera terminated her on July 12, 2022. She was one of only two female Client Partners out of approximately 23 at the firm, and was either the oldest or second-oldest Client Partner.

2. The timing of the termination was remarkable: Aera fired Plaintiff *within two days* of the submissions of *three* major deal proposals on which she would have earned commissions. She was also terminated shortly after complaining that a deal she had won was reassigned to a younger, male co-worker – something, she told two of her managers, that Aera would never have done to a man. By terminating her, Aera deprived Plaintiff of commissions that were the result of years of hard work – a step that Aera's all-male leadership felt comfortable taking against an older, female Client Partner. Just weeks after firing her, Aera hired two additional younger male Client Partners. Aera reassigned all of Plaintiff's deals to male Client Partners, including one of the new younger males. The decision-maker for the termination spoke publicly of his desire to hire "young studs," and routinely praised new hires for their physical attractiveness.

## PARTIES

3. Ms. Byers is a resident of Carver County in the State of Minnesota. She was an employee of Defendant from April 2018 until her termination on July 12, 2022.

4. Defendant Aera Technology, Inc. is a California corporation with its principal place of business in Mountain View, California (Santa Clara County).

## VENUE AND JURISDICTION

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the Parties are diverse and the amount in controversy exceeds $75,000. This Court also has subject matter jurisdiction under 28 U.S.C § 1331 because this action arises, in part, under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act.

6. Venue is proper in this Court and the San Jose Division under 28 U.S.C. § 1391(b) because Defendant's principal place of business is in Mountain View, California, and the conduct complained of herein took place principally in Santa Clara County.

## PROCEDURAL ALLEGATIONS

7. Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission, which was dual filed with the California Civil Rights Department, on August 30, 2022. Plaintiff obtained a notice of Right-to-Sue on June 29, 2023. The Parties entered into a tolling agreement on September 18, 2023 pending mediation that tolled the running of the statute of limitations until three weeks after the date the matter was mediated – *i.e.*, until February 12, 2024 – at which point it began running again. All causes of action herein are timely filed.

## FACTS

8. Ms. Byers began working at Aera on April 23, 2018, not long after it was founded in 2017. At that point, the Company's product was vaporware – *i.e.*, it did not yet exist. As a Client Partner, Ms. Byers was tasked with building relationships with potential clients and generating sales. Her salary was $220,000. She and Aera entered into commission agreements under which she would earn commission of eight percent on any SaaS contracts she won.

### *Deals Ms. Byers Generated*

9. In 2019, Ms. Byers sold a 14-week "pilot" to 3M for $300,000. Upon information and belief, this was the only new client brought in by any Client Partner that year. During the 3M pilot, it became clear that Aera's software could not yet do what its technology team had claimed, and it took Aera nearly a year to complete the pilot. 3M decided not to proceed with a SaaS contract, and Ms. Byers received no commission.

10. The amorphous nature of Aera's product made it hard for any of the Client Partners to sell it. As a result of this, and due to COVID, Ms. Byers and the other approximately eleven U.S.-based Client Partners all had a difficult time converting clients.

11. By May 2021, Aera finally developed a working platform (Aera 2.0). From that point, Ms. Byers rapidly brought in four deals.

12. Back in June 2020, Ms. Byers had generated a relationship with CSL Behring

("CSL") and had begun discussions on a deal. After a delay caused by COVID, Ms. Byers successfully navigated a lengthy competitive bidding process with CSL, including responding to a formal RFI (Request for Information), RFP (Request for Proposal), and then "Orals," which required Ms. Byers to lead a technical presentation on the suitability of Aera's product to CSL's needs. Aera's CEO emailed the leadership team that the Orals presentation was so good that it set a new company standard. On May 12, 2022, CSL informed Aera that Aera had won the project. CSL decided to start with a pilot and SaaS for one segment of Aera's four-segment proposal. Aera's proposal, including all four segments, was quoted at $1 million to $1.6 million. CSL's representative told Ms. Byers that if the technology was successful, CSL planned to offer an "enterprise" agreement to Aera – this means that CSL would be agreeing to the expansion of Aera's SaaS contract without requiring Aera to go through a competitive bidding process. The value of such a monetary agreement would have been very significant. All that remained to close the sale was to finalize and sign the purchase order for the pilot/SaaS project.

13. On May 13, 2022, one day after learning that Aera had won the business, Aera reassigned the CSL account from Ms. Byers to a younger male colleague, Jan Rudnick, who had had zero involvement with the proposal and was based in Australia. Ms. Byers was devastated. Her supervisors, Tom Stephenson and Barry Kent, told her they were shocked – the decision had come from above them, presumably from CEO Fred Laluyaux.

14. On May 23, 2022, Ms. Byers complained by email to Mr. Laluyaux, explaining that she had "put two years into [the] relationship [with CSL]" and was responsible for bringing in the RFI, RFP, and Orals invitation. He responded: "we will discuss it internally and get back to you." Ms. Byers also complained repeatedly to Mr. Stephenson and Mr. Kent that Aera would never do this to a man. This occurred in a separate Zoom meeting with each of them and over Slack with Mr. Stephenson. Mr. Stephenson's reaction over Zoom was to grimace and to say that he had Slacked Mr. Laluyaux that it "wasn't right." Mr. Kent (who was new to the Company) reacted by commenting about how women had often been the best salespersons at his prior firm, and that he knew what it felt like to have a deal stolen (because he had had the experience at his prior firm).

15. Mr. Stephenson later told Ms. Byers he had discussed the reassignment with Mr.

Laluyaux and then followed up by email to ask Mr. Laluyaux if he had discussed the issue with Rajeev Mitroo of Aera Australia (Jan Rudnick's manager).  Mr. Laluyaux stated in an email to Mr. Stephenson that there had been "no foul play" and that Ms. Byers should "stand[] down," also faulting her for having been too "aggressive" in pursuing the company.  The person to whom she was supposedly "too aggressive" was someone she had never even interacted with.

16. Because Aera removed her from CSL, she lost out on commission on the pilot/SaaS deal she had won.  She also stood to lose out on the remainder of the full four-segment deal, as well as the future commission from the anticipated expanded work.  Further, by taking the CSL account away from Ms. Byers just before the SaaS was signed, Aera could later rely on the position that she had not closed any new SaaS deals to justify her termination.

17. Another deal Ms. Byers generated was with Whirlpool.  In March 2021, Ms. Byers generated a lead with Whirlpool and again successfully navigated an RFI.  Ms. Byers then led the team responding to an RFP, dedicating at least thirty hours weekly to the proposal up until the time of her termination on July 12, 2022.  The *day before* submitting the proposal, Aera terminated her.  The agreement between Whirlpool and Aera was expected to generate a very significant amount of SaaS revenue over three years.  The account was reassigned to Paul Schmidt, who had been there longer than Ms. Byers and still had not brought in a single new client as of her termination date.  Likely because Ms. Byers had been the owner of the relationship, the deal did not close once she was removed.

18. Another deal Ms. Byers generated was with Purolite.  After cultivating a relationship with Ecolab (which acquired Purolite in December 2021) for about a year and a half, Ms. Byers received a verbal RFP from Purolite in June 2022, meaning if they could come to a deal, the deal would be "sole-sourced" to Aera without any formal RFP.  On June 14-16, 2022 (shortly before her termination), Ms. Byers was in Pennsylvania running a workshop with Purolite hammering out what Aera's proposal would look like – a position she was in because she had been developing a relationship with the key decisionmaker for two years.  The resulting proposed SaaS contract was significant, and would have generated significant commission for Ms. Byers.  Aera terminated Ms. Byers *two days before* Aera submitted its proposal to Purolite.  Shortly after her termination, Ms.

Byers's contact at Purolite notified her that Purolite had decided not to move forward with the deal because Ms. Byers was no longer at the Company ("with your exit, I'm really slowing things down with Aera").

19. Yet another deal Ms. Byers generated was with Proximo, which she initiated through a contact of hers there in March 2022. The contact told her "we'll do an RFP, but you get the business." Proximo sent Aera (through Ms. Byers) an RFP in late April or early May 2022. Ms. Byers led the response and organized a 2-day workshop in New Jersey with Proximo leaders to discuss it. Proximo asked Aera to submit a revised proposal. Ms. Byers sent Proximo revisions, and her contact at Proximo told her: "This is just what we were looking for." The SaaS contract was significant, expected to generate significant commission for Ms. Byers. Upon information and belief, Aera presented the proposal to Proximo the day after terminating Ms. Byers, and the account was reassigned to one of the two new male Client Partners who replaced her. Upon information and belief, the deal closed at the quoted purchase price one month after Ms. Byers was terminated.

20. Aera terminated Ms. Byers on July 12, 2022. In addition to her salary of $220,000 per year, at the time Aera terminated Ms. Byers, she and the Company reasonably expected her to be owed significant commission from deals with Whirlpool, Purolite, and Proximo, as well as CSL. Aera also would reasonably have expected these deals to result in expanded service orders over the following years generating additional significant commissions. Aera terminated Ms. Byers because she was a 60-year old woman, and because it was willing to dispose of a 60-year old woman in order to avoid paying her valuable commissions she had earned. If Ms. Byers had been a younger male Client Partner, Aera would not have terminated her.

***Ms. Byers's Performance Relative to Younger, Male Counterparts***

21. In her last performance evaluation on March 14, 2022, just a few months before she was terminated, her manager Tom Stephenson rated her as "consistently meets expectations." He also wrote: "Denise's super power is relationships and relationship building[]," and recognized her for "the win at Whirlpool," for "creating two to three live deals at CSL," and for getting to the point that Ecolab is activ[e]ly looking for a use case." Shortly before she was terminated, he verbally praised her for developing "the best pipeline in the Company." Although she was told to "close

deals," the same feedback was given to all Client Partners at weekly sales meetings.

22. Upon information and belief, unlike Ms. Byers, who brought in the new clients identified above, many of her younger, male Client Partner counterparts failed to bring in a single new deal. Paul Schmidt brought in zero new clients in his five years, Deepak Nawal brought in zero in his 4.5 years, Bill Lenihan brought in zero in his year tenure, Andrew Driscoll brought in zero in his tenure, Satish Bhat brought in zero in his 11-month tenure, Greg Leary brought in zero in his 13-month tenure, and Yash Mahendra brought in zero in his 7-month tenure. Adrian Perry brought in 2 new clients, but none that signed a SaaS subscription (just pilots) in his three-year tenure. Don Kirkwood brought in one new client, but none that signed a SaaS subscription (just a pilot) in his two-year tenure. Srini Murthy and Andy Brown each brought in one new SaaS client (although Mr. Brown's client contacted Aera on its own initiative, without any outreach by him).

23. Of the male Client Partners who closed sales, the majority of those were expansions of services for existing customers, which was far easier than generating new clients. Ms. Byers was not given any existing customers to expand.

24. Ms. Byers was treated worse than her similarly situated younger male colleagues because of her age and gender.

### *Aera's Young, Male Workplace Culture*

25. Aera is a male-centric company in Silicon Valley. Upon information and belief, the executive team includes zero women, the board of directors includes zero women, and the current workforce of Client Partners in the United States includes zero women.

26. Within one month of Ms. Byers's termination, the Company hired two significantly younger male Client Partners. Upon information and belief, in all of Aera's history, it has employed only three female Client Partners other than Ms. Byers out of dozens globally. Upon information and belief, all three female Client Partners resigned within about a year or less.

27. Throughout her employment at Aera, Ms. Byers was excluded by the gendered dynamics of the firm. The men in leadership – CEO Laluyaux and CRO Gonzalo Benedit – boasted about hiring "young studs" or "gentlemen." The firm's "in group" was based on male camaraderie, with men cheerfully addressing each other as "sir," while the few women were

relegated to the "out group" and addressed by their names as an afterthought, if at all. Emails were addressed to "Gentlemen," even when Ms. Byers was among the recipients.

28. Upon information and belief, CEO Laluyaux engaged in other conduct that led to a discriminatory atmosphere and that demonstrated to employees, including Plaintiff, that the CEO treated female subordinates differently from other employees depending on their age and gender.

29. The Company also favored youth generally. Upon information and belief, at 60 years old at the time of her termination, Ms. Byers was the oldest or second-oldest Client Partner at the firm (one male Client Partner, Paul Schmidt, was around her age), with the typical Client Partner in his 30s or 40s. Mr. Laluyaux preferred for the Company to hire physically attractive, and thus generally younger, employees. At all-hands meetings (which were recorded), he would show photos of new hires and make comments such as "We only hire beautiful people." Ms. Byers's supervisor, Mr. Stephenson, would make comments referring to the "old farts" on the call, and would include Ms. Byers. Shortly after terminating Ms. Byers, the Company hired two more "young studs."

## FIRST CAUSE OF ACTION

**(Sex Discrimination in Violation of FEHA, Gov. Code § 12940(a) *et seq.*)**

30. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

31. It is unlawful for an employer to discriminate against an employee on the basis of sex. Cal. Gov. Code § 12940(a).

32. Plaintiff suffered an adverse employment action when Defendant terminated her employment on July 12, 2022. Plaintiff also suffered an adverse employment action when she was removed from the CSL account.

33. For the reasons stated above, Plaintiff's sex (female) was a substantial motivating factor for the adverse actions she suffered.

34. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits and has incurred other economic losses.

35. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress damages in an amount to be proven at trial.

36. Plaintiff is entitled to punitive damages from Defendant in an amount according to proof. In committing the acts described above, Defendant was guilty of despicable conduct that subjected Plaintiff to cruel and unjust hardship in disregard of Plaintiff's rights, and/or that was carried on by Defendant with a willful and conscious disregard of Plaintiff's rights, or that otherwise met the standard for punitive damages set forth in California Civil Code § 3294. The wrongful actions were taken and/or ratified by managing agents. Among other things, as CEO, Mr. Laluyaux is managing agent of Defendant and took or ratified the actions alleged herein.

37. Plaintiff is also entitled to recovery of her attorneys' fees and costs.

## SECOND CAUSE OF ACTION

**(Sex Discrimination in violation of Title VII, 42 U.S.C. § 2000e–2(a))**

38. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

39. It is unlawful for an employer to discriminate against an employee on the basis of sex. 42 U.S.C. § 2000e–2(a).

40. Plaintiff suffered an adverse employment action when Defendant terminated her employment on July 12, 2022. Plaintiff also suffered an adverse employment action when she was removed from the CSL account.

41. For the reasons stated above, Plaintiff's sex (female) was a substantial motivating factor for the adverse actions she suffered.

42. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits and has incurred other economic losses.

43. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress damages in an amount to be proven at trial.

44. Plaintiff is entitled to punitive damages from Defendant in an amount according to proof. In committing the discriminatory acts described above, Defendant acted with malice,

oppression, or reckless indifference to Plaintiff's federally protected rights under 42 U.S.C §1981a(b).  The wrongful actions were taken and/or ratified by managing agents.  Among other things, as CEO, Mr. Laluyaux is managing agent of Defendant and took or ratified the actions alleged herein.

45. Plaintiff is also entitled to recovery of her attorneys' fees and costs.

## THIRD CAUSE OF ACTION

**(Age Discrimination in Violation of FEHA, Gov. Code § 12940 *et seq*.)**

46. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

47. It is unlawful for an employer to engage in discrimination on the basis of age.  Cal. Gov. Code § 12940(a).

48. Plaintiff was 60 years old at the time of the adverse employment actions.

49. For the reasons set forth above, Plaintiff's age was a substantial motivating factor for the adverse actions she suffered.

50. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits and has incurred other economic losses.

51. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress damages in an amount to be proven at trial.

52. Plaintiff is entitled to punitive damages from Defendant in an amount according to proof.  In committing the acts described above, Defendant was guilty of despicable conduct that subjected Plaintiff to cruel and unjust hardship in disregard of Plaintiff's rights, and/or that was carried on by Defendant with a willful and conscious disregard of Plaintiff's rights, or that otherwise met the standard for punitive damages set forth in California Civil Code § 3294.  Among other things, as CEO, Mr. Laluyaux is managing agent of Defendant and took or ratified the actions alleged herein.

53. Plaintiff is also entitled to her attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

**(Age Discrimination in Violation of ADEA, 29 U.S.C. § 623)**

54. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

55. It is unlawful for an employer to discriminate against an employee on the basis of age. 29 U.S.C. § 623.

56. Plaintiff was 60 years old at the time of the adverse employment actions.

57. For the reasons set forth above, Plaintiff's age was the reason for the adverse actions she suffered.

58. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits and has incurred other economic losses.

59. Plaintiff is entitled to liquidated damages from Defendant in an amount according to proof. In committing the acts described above, Defendant's misconduct was willful. Defendant knew or showed reckless disregard for whether its discriminatory acts toward Plaintiff were unlawful.

60. Plaintiff is also entitled to her attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

**(Retaliation in Violation of FEHA, Gov. Code § 12940(h))**

61. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

62. It is unlawful for an employer to retaliate against an employee for opposing conduct she reasonably believes to be discriminatory. Cal. Gov. Code § 12940(h).

63. Plaintiff engaged in protected activity when she complained to Mr. Laluyaux, Mr. Stephenson, and Mr. Kent in or about May 2022 about the reassignment of the CSL account to male Client Partner Mr. Rudnick on the basis of sex. In particular, she complained to Mr. Stephenson and Mr. Kent that the CSL deal would not have been taken away from her if she had been a man.

64. Because she complained, Plaintiff was terminated in July 2022, shortly after making

the complaints.

65. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits and has incurred other economic losses.

66. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress damages in an amount to be proven at trial.

67. Plaintiff is entitled to punitive damages from Defendant in an amount according to proof. In committing the acts described above, Defendant was guilty of despicable conduct that subjected Plaintiff to cruel and unjust hardship in disregard of Plaintiff's rights, and/or that was carried on by Defendant with a willful and conscious disregard of Plaintiff's rights, or that otherwise met the standard for punitive damages set forth in California Civil Code § 3294. The wrongful actions were taken and/or ratified by managing agents. Among other things, as CEO, Mr. Laluyaux is managing agent of Defendant and took or ratified the actions alleged herein.

## SIXTH CAUSE OF ACTION

### (Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3(a))

68. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

69. It is unlawful for an employer to retaliate against an employee for opposing conduct that they reasonably believe to be discriminatory. 42 U.S.C. § 2000e-3(a).

70. Plaintiff engaged in protected activity when she complained to Mr. Laluyaux, Mr. Stephenson, and Mr. Kent in or about May 2022 about the reassignment of the CSL account to male Client Partner Mr. Rudnick on the basis of sex. In particular, she complained to Mr. Stephenson and Mr. Kent that the CSL deal would not have been taken away from her if she had been a man.

71. Because she complained, Plaintiff was terminated in July 2022, shortly after making the complaints.

72. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits and

has incurred other economic losses.

73. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress damages in an amount to be proven at trial.

74. Plaintiff is entitled to punitive damages from Defendant in an amount according to proof. In committing the discriminatory acts described above, Defendant acted with malice, oppression, or reckless indifference to Plaintiff's federally protected rights under 42 U.S.C §1981a(b). The wrongful actions were taken and/or ratified by managing agents. Among other things, as CEO, Mr. Laluyaux is managing agent of Defendant and took or ratified the actions alleged herein.

## SEVENTH CAUSE OF ACTION
### (Whistleblower Retaliation, California Labor Code § 1102.5)

75. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

76. It is unlawful for an employer, or any person acting on behalf of the employer, to "retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information. . . . to a person with authority over the employee or another employee who has the authority to investigate, discovery, or correct the violation or noncompliance. . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute…." Cal. Lab. Code § 1102.5.

77. Plaintiff engaged in protected activity when she complained about the reassignment of the CSL account to younger male Client Partner Mr. Rudnick on the basis of sex. She reasonably believed this disclosed a violation of California and federal discrimination laws (*i.e.*, Cal. Gov. Code § 12940(a); 42 U.S.C. § 2000e–2(a); 29 U.S.C. § 623(d)). In addition, she reasonably believed this disclosed a violation of her right to be paid all wages owed when earned under California Labor Code § 204.

78. Because she complained, Plaintiff was terminated in July 2022, shortly after making the complaints.

79. As a direct, foreseeable, and proximate result of Defendant's unlawful actions,

Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits and has incurred other economic losses.

80. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress damages in an amount to be proven at trial.

81. Plaintiff is entitled to punitive damages from Defendant in an amount according to proof. In committing the acts described above, Defendant was guilty of despicable conduct that subjected Plaintiff to cruel and unjust hardship in disregard of Plaintiff's rights, and/or that was carried on by Defendant with a willful and conscious disregard of Plaintiff's rights, or that otherwise met the standard for punitive damages set forth in California Civil Code § 3294. Defendant's managing agents engaged in or ratified the retaliation. Among other things, as CEO, Mr. Laluyaux is managing agent of Defendant and took or ratified the actions alleged herein.

## EIGHTH CAUSE OF ACTION

### (Wrongful Termination in Violation of Public Policy)

82. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

83. It is unlawful for an employer to terminate an employee to avoid paying a benefit that she has earned. *See King v. U.S. Bank N.A.,* 53 Cal. App. 5th 675 (2020).

84. It is against public policy to terminate against an employee because she complained about being denied commission. *See, e.g.*, *Phillips v. Gemini Moving Specialists*, 63 Cal. App. 4th 563, 571 (1998), as modified (Apr. 24, 1998) ("[I]s there a fundamental public policy against an employer's retaliation for its employee having asserted a right to be free from the employer's withholding of pay, as alleged to have occurred in this case? We conclude there is such a fundamental public policy.").

85. Plaintiff did all of the work required of her to generate the RFPs and prepare the proposals. Once the client signed an agreement for the proposed services, she would be entitled to commission. Defendant terminated her to avoid paying her commission that she would otherwise be owed.

86. Further, Plaintiff complained in good faith about being denied commission for the

CSL deal, and Defendant terminated soon after.

87. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings and other employment benefits and has incurred other economic losses.

88. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered emotional distress damages in an amount to be proven at trial.

89. Plaintiff is entitled to punitive damages from Defendant in an amount according to proof. In committing the acts described above, Defendant was guilty of despicable conduct that subjected Plaintiff to cruel and unjust hardship in disregard of Plaintiff's rights, and/or that was carried on by Defendant with a willful and conscious disregard of Plaintiff's rights, or that otherwise met the standard for punitive damages set forth in California Civil Code § 3294. Among other things, as CEO, Mr. Laluyaux is managing agent of Defendant and took or ratified the actions alleged herein.

## NINTH CAUSE OF ACTION

**(Breach of Contract)**

90. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

91. When an employee has performed the actions necessary to earn commission under a written contract and is waiting for a legal condition precedent to occur before she receives payment, the other party may not prevent the condition precedent from occurring for the purpose of denying the employee her commissions. DLSE Opn. Letter No. 1999.01.09 (January 9, 1999) ("If the commission has not yet been earned at the time of termination, and is awaiting the completion of some legal condition precedent …. the commission must be paid to the terminated employee immediately upon the competition of the conditions precedent."); *Wood v. IGATE Techs. Inc*, 2015 U.S. Dist. LEXIS 189105 (when "[n]o further action was required on Plaintiff's part to complete the deals leading to the delivery of the commission . . . . except performing the condition precedent of remaining employed," employee stated claim for breach of the agreement).

92. Throughout her employment, Plaintiff performed work for Defendant pursuant to

written and binding commission contracts.

93. Plaintiff had performed the work necessary to earn commission on the CSL, Whirlpool, Ecolab/Purolite, and Proximo deals prior to her termination.  As soon as CSL committed to enter into an agreement with Defendant, Defendant reassigned the deal to Plaintiff's younger male colleague.  Defendant terminated Ms. Byers just days before the proposals she spearheaded for the other three deals were submitted.  The Proximo Spirits deal closed shortly after her termination.

94. By terminating her, Defendant prevented Plaintiff from performing the final conditions of the contract under which she would otherwise be entitled to commission pay.

95. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has been damaged by not receiving the commission she should have received under the commission agreement.

## TENTH CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

96. Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

97. In any contract, there is an implied duty of good faith and fair dealing.  "Where a contract confers one party with discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *McCollum v. Xcare.net, Inc.*, 212 F. Supp. 2d 1142, 1152 (2002) (internal citations omitted).  The covenant is breached when discretionary authority is exercised "in bad faith for the purpose of frustrating the other party's legitimate expectations and denying the other party the actual benefits of the agreement.  *Id*.

98. Throughout her employment, Plaintiff performed work for Defendant pursuant to a commission contract.

99. Plaintiff had performed the work necessary to earn commission on the CSL, Whirlpool, Ecolab/Purolite, and Proximo deals prior to her termination.

100. Defendant deprived Plaintiff of the benefits of her commission bargain by

terminating her just before the final conditions under her agreement were fulfilled. In doing so, Defendant breached the duty of good faith and fair dealing.

101. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has been damaged by not receiving the commission she should have received under the commission agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1. For compensatory damages, including but not limited to, lost back pay, lost front pay, lost commissions, lost benefits, lost equity, and lost perquisites, as well as damages for emotional distress and pain and suffering, according to proof allowed by law;

2. For punitive damages;

3. For liquidated damages;

4. For an award of her attorneys' fees and costs;

5. For an award of interest (including pre-judgment and post-judgment interest) as allowed by law; and

6. For such further legal and equitable relief as the Court deems just and proper.

DATED: February 14, 2024        THE JHAVERI-WEEKS FIRM, P.C.

By: /s/ William C. Jhaveri-Weeks
William C. Jhaveri-Weeks
Sarah Abraham*
Ally N. Girouard

*Attorneys for Plaintiff*

\* Admission to N.D. Cal. anticipated shortly

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests trial by jury on all causes of action so triable.

DATED: February 14, 2024         THE JHAVERI-WEEKS FIRM, P.C.

By: /s/ William C. Jhaveri-Weeks
William C. Jhaveri-Weeks
Sarah Abraham*
Ally N. Girouard

*Attorneys for Plaintiff*

\* Admission to N.D. Cal. anticipated shortly